# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00932-COA

JUSTIN CLARK A/K/A JUSTIN E. CLARK                    APPELLANT

v.

STATE OF MISSISSIPPI                                            APPELLEE

DATE OF JUDGMENT:            06/17/2024
TRIAL JUDGE:                 HON. CHARLES E. WEBSTER
COURT FROM WHICH APPEALED:   BOLIVAR COUNTY CIRCUIT COURT,
                             SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      GRAHAM PATRICK CARNER
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:           BRENDA FAY MITCHELL
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 REVERSED AND REMANDED - 09/23/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.    A man was accused of inappropriately touching his girlfriend's young daughter. He was subsequently indicted on one count of sexual battery. After a jury trial, he was found guilty. On appeal, he raises multiple issues, including that the State's closing argument was improper.

¶2.    Finding the State improperly referred to nonexistent DNA evidence and repeatedly commented on evidence excluded by a pretrial order, we reverse and remand.

## FACTS

¶3.    On the morning of February 13, 2019, Shameka Pates heard a scream from her six-

year-old daughter, Jane.[1]  She called for Jane to come to her bedroom and tell her what was wrong.  When Jane entered her mother's bedroom, Shameka was sitting in bed with her boyfriend, Justin Clark.  The little girl explained to her mother that she felt pain when she used the restroom that morning.

¶4.     Shameka proceeded to visually examine her daughter's vagina while Clark remained in the room.  Her mother saw a scratch on the child's genitals and questioned Jane about the cause of her injury.  Jane told her mother that Clark had hurt her.  Shameka immediately "told [him] to get out."

¶5.     After Clark left, Shameka "drove [Jane's] siblings to school," and then she and Jane "went to the sheriff's department."  Jane would testify that it was not until later, when she and her mother were driving to the sheriff's department, that she revealed Clark had put his finger inside her vagina the night before.  Clark was later indicted for one count of sexual battery.  He was also indicted as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Supp. 2018).

## PROCEDURAL HISTORY

¶6.     Because Clark's first trial resulted in a mistrial, this case has a lengthy pretrial history spanning nearly five years between the initial indictment and Clark's second trial.  For purposes of clarity, we briefly discuss a pretrial motion made before Clark's first trial, as it becomes a point of contention during his second trial, as well as on appeal.

---

[1] We use a pseudonym to protect the minor child's identity.

2

¶7.     Prior to Clark's first trial, the defense disclosed an assortment of information provided by Clark concerning his relationship with Shameka.  Specifically, Clark's discovery disclosures appeared to reveal that he and Shameka continued their relationship even after he was indicted for sexual battery of Jane.  Among other disclosures, his discovery included telephone and email conversations between him and Shameka, Cash App payments from Clark to Shameka, explicit videos purportedly of Shameka, and pictures of the two during multiple hotel visits.

¶8.     Clark's disclosures also included what appears to be a ledger of some sort that detailed the dates, times, and locations he and Shameka interacted.  The ledger contained additional columns where Clark detailed the interaction, along with the amounts he allegedly paid.  According to the ledger, the interactions ranged from "Sex + Time Together" to "Paid Her Water Bill" to "Kid's Food."

¶9.     In response, the State filed a motion to exclude all this evidence.  Specifically, the State's motion focused on the post-charge interactions Shameka had with Clark.  The State argued that the "mother's activity" after Jane was harmed was "not relevant" and "appears intended only to prejudice the Court and the jury against the victim's mother."  The State's motion also added that even though "children are often victimized because of poor choices by their mothers or parents . . . this does not make such evidence relevant."

¶10.    In response, Clark argued that because he had not yet "determined which evidence

he [would] attempt to introduce at trial," he was simply "disclosing all the evidence he ha[d] in his possession," which "satisfied his duty to disclose any potential evidence to the State which may be introduced in trial consistent with Mississippi Rules of Criminal Procedure 17.3." Therefore, because he "ha[d] made no effort to introduce anything into evidence," Clark contended that ruling "on the relevancy and admissibility [of any potential evidence] prior to trial" was "impossible for the Court at this time."

¶11. A hearing was held regarding the State's motion in December 2022. Because the trial court "was having a difficult time determining what [it] thought the relevancy of these matters were," the defense was asked to explain "the possible relevancy . . . relative to the mother as it relates to the allegations involving the child."

¶12. The defense asserted the post-charge relations between the victim's mother and Clark were relevant to show a potential motive to fabricate the allegations of sexual battery. The defense further asserted it was "important for a jury to know [about] this subsequent interaction" so they could properly weigh the mother's "credibility."

¶13. Acknowledging that there is "[o]bviously . . . no such thing as impeachment" if Shameka "doesn't testify," the trial court ultimately refrained from ruling on the State's motion to exclude at that juncture.

*First Trial Resulting in Mistrial*

¶14. Clark's first trial was held in June 2023. During that trial, counsel for Clark attempted to elicit certain testimony from the victim without first providing the requisite notice to both

4

the State and the trial court. Consequently, this resulted in a mistrial, and the case was reset.

*Clarification on the State's Previous Motion to Exclude*

¶15. In preparation for Clark's second trial, a pretrial hearing was held in November 2023 to again discuss the State's motion to exclude evidence supplied by the defense. Maintaining the arguments raised at the pretrial hearing almost a year earlier, the State added that it would not be calling Shameka, the victim's mother, as a witness.

¶16. The defense then sought clarity from the trial court regarding its ruling on the State's motion. The trial court ultimately found either Shameka or Clark "testifying as to the event" was permissible, but made clear it "d[id]n't think *anything* that happened afterwards [wa]s relevant." (Emphasis added).

¶17. The trial court allowed testimony about Jane's allegation of sexual battery and the particular incident that sparked the allegation. But "*anything* that happened afterwards" was expressly prohibited, as it was ruled irrelevant. (Emphasis added).

¶18. The trial court allowed counsel for Clark to make an offer of proof for the record.

*The State's Proof During the Second Trial*

¶19. At trial, the State called three witnesses: the investigator, the victim, and the family nurse practitioner. Simon Bush, an investigator with the Bolivar County Sheriff's Department, testified first. Explaining that his involvement in the case began after a fellow colleague asked him to take over, Investigator Bush further explained that the victim's mother, Shameka, came into the sheriff's department to make the complaint on behalf of her

5

daughter.

¶20. Due to the nature of the allegation, the investigator told the jury that department protocol requires that a forensic interview be scheduled with the child, as opposed to performing the interview themselves. Investigator Bush explained that forensic interviewers are "people that specialize in [how to] talk to the child [and] ask certain questions." He disclosed that sometimes the forensic interviewers "have drawings [where] the child identif[ies] different body parts and basically tell[s] them what happened."

¶21. When asked specifically about Jane's forensic interview and whether he was visible to her during the interview, the investigator responded, "No," explaining he was in another room observing through one-way glass. Investigator Bush testified that after Jane provided her account of the incident to the forensic interviewer, Clark was arrested for sexual battery.

¶22. On cross-examination, Investigator Bush clarified that Shameka did not make her complaint with him personally, but with a fellow colleague who was initially assigned the case. He further clarified that this person was the same colleague who interviewed Shameka on the day she made her complaint and that he did not receive the case until "[a]bout five or six days later." Inquiring into the steps taken—or not taken—during the investigation, the defense then elicited the following testimony from the investigator:

> The Defense: . . . we can agree that nobody from the Bolivar County Sheriff's Department went to the scene where this sexual battery is supposed to have taken place, right?
>
> Investigator Bush: That's correct.

6

| | |
|---|---|
| The Defense: | Nobody took one photograph of anywhere inside that house to preserve any of the way that that house looked when the sexual battery is supposed to have occurred, right? |
| Investigator Bush: | That's correct. |
| The Defense: | And we agree *nobody collected sheets, underwear, clothing*, anything for suspicion of blood, injury, *DNA, anything like that*, from where this child lived, right? |
| Investigator Bush: | *Correct.* |
| . . . . | |
| The Defense: | There are no photographs, right? *There's no physical evidence, right?* |
| Investigator Bush: | *Correct.* |

(Emphasis added).

¶23. Jane took the stand next. Although eleven by the time she testified, she was six years old when the alleged incident occurred. She testified that Clark had been her "mama's boyfriend" for as long as she could remember, though she had always referred to him as "Justin," never "Daddy." After disclosing Clark had been living with her family, Jane described the usual sleeping arrangements in the home. She explained that she had her own bedroom, her siblings "slept in the bedroom together," and Clark slept "[i]n my mother's room."

¶24. Then, Jane recounted the instance of abuse to the jury. She explained how one night, after she had already gone to bed, Clark asked to come into her room. Because she "was

7

scared," she told him yes, and then she "went to sleep." At some point throughout the night, she disclosed Clark "fingered" her and told her to "go to sleep." When she woke up the next morning, Jane testified that Clark was no longer in her room. She further testified that while using the restroom that morning, she "screamed" because her vagina "was burning."

¶25. Moments after her scream, Jane told the jury how her mother called for Jane to come to her room. Jane recalled how her mother briefly inspected her while still "in her bed" with Clark in the room and "on his side of the bed." After "she saw what happened," Jane testified that her mother "told [Clark] to get out."

¶26. During cross-examination, Jane was asked if she still lived in Mississippi. She confirmed that she no longer lived in Shelby, nor did she still live in Mississippi. But Jane was never asked by the defense or by the State where she currently lived, nor did she personally offer that information at any point throughout the trial.

¶27. The State's last witness was Leslie Tabb, a family nurse practitioner at the Family Medical Clinic in Cleveland. Tabb was accepted as an expert in the field of family medicine as a nurse practitioner by the trial court. Tabb testified that on February 13, 2019, Jane's "mother brought her in to be examined . . . because she complained of hurting when she urinated that morning." Tabb testified that during her visit, Jane revealed that Clark "had touched her . . . private area, the night before." When asked what Clark used to touch Jane, the family nurse practitioner clarified that Jane disclosed Clark had "put his finger in there."

¶28. When asked what she observed during her examination of Jane, Tabb responded that

8

she "observed . . . a superficial laceration in – on her labia" about an inch long and that "[h]er hymen was not intact." However, she noted that a child falling off a bicycle could just as easily cause damage to the hymen and that aside from the laceration, she "did not see" any bruising, tears, or blood present. Tabb further disclosed that Jane's examination appeared to be abnormal, reasoning that she "would not expect a child her age to have that type of injury without some sort of outside cause," coupled with the fact Jane informed her that "someone had done that to her."

¶29. During cross-examination, Tabb clarified that she was testifying in her capacity as a family nurse practitioner, not as a sexual assault nurse examiner (SANE)—an entirely separate specialty. When asked about the specifics of Jane's examination, Tabb disclosed that she performed a visual inspection of the child's private area using "only [her] hand," but no other examinations were performed. She added that she did not take any vaginal swabs for the presence of DNA because that job was reserved for employees in the emergency room since "[w]e are not allowed to do that."

¶30. After the State rested its case-in-chief, the defense moved for a directed verdict arguing that the State failed to show a prima facie case of sexual battery. In "considering all the evidence" presented by the State, the trial court found that it "presented at least a prima facie case . . . sufficient to go to a jury." Accordingly, the defense's motion was denied.

*The Defense's Case-in-Chief*

¶31. The defense presented only one witness on Clark's behalf: Sharlotta Sharp, a

9

registered nurse experienced in treating victims of sexual assault. Sharp informed the jury of her certifications as a pediatric, adolescent, and adult SANE. Accordingly, she was accepted by the trial court "as an expert in the field" and was allowed to "give testimony and opinions as a sexual assault nurse examiner."

¶32. When asked what materials she reviewed in order to prepare her testimony, Sharp responded that she "reviewed a medical note that was created from an encounter" and "previous testimony of a clinician that saw a patient." Attempting to specify her testimony, defense counsel asked Sharp if the medical note she reviewed was written by Leslie Tabb. Sharp confirmed that it was. Based on Tabb's note—which documented a finding of a small superficial laceration on Jane's labia—Sharp was asked whether the laceration was concrete evidence of sexual battery. In response, Sharp explained that this "[wa]s not a conclusion." The defense then elicited the following testimony:

Defense: And with regard to the scratch on the labia minor[a], is that proof positive of a sexual battery?

Sharp: It is not.

Defense: How else could somebody get scratched?

Sharp: Just like you can get scratched [on] any other part of your body. It could be inflicted. It could be self-inflicted. So that pretty much is – the only conclusion I could make if I saw a scratch is that there is a scratch. I'm not able to conclude how that scratch got there. But just like you can get a scratch anywhere, you can get a scratch on the genitalia as well.

Defense: So after reviewing the half page nurses's note in this case and reviewing the trial testimony of Nurse Tabb, have you made any

10

conclusions in this case as to whether [Jane] was a victim of sexual battery?

Sharp:   I've not made any conclusion on that.

¶33. On cross-examination, the State inquired into whether Sharp had examined Jane. Sharp disclosed that she had not personally examined Jane, nor had she ever seen Jane. The defense subsequently rested its case-in-chief.

*State's Closing Argument*

¶34. Even though the investigator, the family nurse practitioner, and the SANE all testified that there was no DNA evidence collected, during its closing argument, the State declared:

> But, ladies and gentlemen, when we talk about evidence, no, I can't compel. *But that scratch left DNA under his nail. I submit that to you. By argument I do submit that to you.*

(Emphasis added).

¶35. Throughout its closing—and despite the trial court's prior ruling—the State also made multiple references to information that was previously excluded. Indicating that "*there's been no motive given to why they would make this up*," the State asked the jury "exactly what interest does [Shameka] have other than that's her daughter, and she's going to be there for her daughter?" (Emphasis added). In reference to Jane, the State announced to the jury, "*she's in Alabama now*, and *her mother took her blood over Justin Clark. She chose her daughter over Justin Clark* and told him to get out because her word was credible." (Emphasis added).

¶36. The State continued. Further maintaining that "*Mama chose her daughter over*

11

*Justin*," it claimed that "*Justin ha*[*d*]*n't gotten over it to this day*." (Emphasis added). Once again, the State posited that "[*Shameka*] *chose her daughter*." (Emphasis added). And again, the State remarked, "she is not—this child is not to be discredited" and that children "may lie to you about a cookie[,] [b]ut she's not even lying about this." Clark made no contemporaneous objection to any of the above statements at trial.

¶37. Ultimately, the jury found Clark guilty of sexual battery. He was sentenced as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 to life imprisonment without eligibility for parole. The trial court denied Clark's motion for judgment notwithstanding the verdict or a new trial. Clark appeals.

**STANDARD OF REVIEW**

¶38. "[P]lain error arises from the long-standing principle that appellate courts will not find a trial judge in error on a matter not first presented to the trial judge for decision." *McCollum v. State*, 372 So. 3d 980, 986 (¶17) (Miss. 2023) (quoting *Taylor v. State*, 330 So. 3d 758, 769 (¶26) (Miss. 2021)). Such "review is properly utilized for correcting obvious instances of injustice or misapplied law." *Ambrose v. State*, 254 So. 3d 77, 111 (¶100) (Miss. 2018) (internal quotation marks omitted) (quoting *Armstead v. State*, 196 So. 3d 913, 916 (¶11) (Miss. 2016)). It "is employed only in situations when a defendant's substantive or fundamental rights are affected." *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016) (internal quotation marks omitted) (quoting *Flora v. State*, 925 So. 2d 797, 811 (¶42) (Miss. 2006)). So "[f]or the plain-error doctrine to apply, there must have been an error that

resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Johnson v. State*, 290 So. 3d 1232, 1240 (¶20) (Miss. 2020) (quoting *Rodgers v. State*, 166 So. 3d 537, 544 (¶15) (Miss. Ct. App. 2014)).

## DISCUSSION

¶39. Clark raises five assignments of error on appeal, including that he was prevented from presenting a complete defense, that the State committed prosecutorial misconduct in its closing argument, that he received ineffective assistance of counsel, that the issuance of a particular jury instruction was improper, and that cumulative error requires reversal.

¶40. Because we find the issue of prosecutorial misconduct dispositive, we decline to address Clark's remaining points of error.

### The State's repeated acts of prosecutorial misconduct in its closing argument denied Clark due process.

¶41. Pointing to the State's closing argument, Clark contends it embodied multiple instances of prosecutorial misconduct, all of which unduly influenced the jury and deprived him of his right to a fair trial. Acknowledging that "these instances of improper argument were not objected to at trial," Clark asserts that "they are reviewable under the plain error doctrine and warrant reversal."

¶42. "Where a prosecutor has made an improper argument, the question on appeal is whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Spiers v. State*, 361 So. 3d 643, 661 (¶68) (Miss. 2023) (internal

13

quotation marks omitted) (quoting *Moffett v. State*, 156 So. 3d 835, 869 (¶103) (Miss. 2014)).

Put simply, "[w]here prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must follow." *White v. State*, 228 So. 3d 893, 904 (¶28) (Miss. Ct. App. 2017) (quoting *Goodin v. State*, 787 So. 2d 639, 653 (¶41) (Miss. 2001)).

¶43.   Crucially, "[t]he purpose of a closing argument is to *fairly* sum up the evidence." *White*, 228 So. 3d at 904 (¶28) (emphasis added) (quoting *Wilson v. State*, 194 So. 3d 855, 864 (¶30) (Miss. 2016)). Recognizing that "attorneys are to be given wide latitude in making their closing arguments," this Court also recognizes that such latitude is not boundless. *Spiers*, 361 So. 3d at 662 (¶71) (quoting *Evans v. State*, 226 So. 3d 1, 31 (¶79) (Miss. 2017)). It is well-settled that "prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Id.* (quoting *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000)). While prosecutors are permitted to "comment upon any facts introduced into evidence . . . draw[ing] whatever deductions and inferences that seem proper . . . from the facts," they are prohibited from "stat[ing] facts which are not in evidence, and which the court does not judicially know, in aid of his evidence." *White*, 228 So. 3d at 904-05 (¶28) (quoting *Galloway v. State*, 122 So. 3d 614, 643 (¶72) (Miss. 2013)). So too are they prohibited from "appeal[ing] to the prejudices of men by injecting prejudices not contained in some source of the evidence." *Id.*

¶44.   Moreover, our Supreme Court has made clear that "[a]rguing statements of fact which

are not in evidence or necessarily inferable from facts in evidence is error when those statements are prejudicial." *Jackson v. State*, 174 So. 3d 232, 237 (¶12) (Miss. 2015) (quoting *Ross v. State*, 954 So. 2d 968, 1002 (¶74) (Miss. 2007)). Here, despite testimony by the investigator, the family nurse practitioner, and the SANE—which all revealed that no DNA evidence was collected—the State blatantly disregarded this evidence, instead suggesting to the jury that DNA evidence was present and available at the time of the alleged incident. Indeed, the State announced:

> But, ladies and gentlemen, when we talk about evidence, no, I can't compel. *But that scratch left DNA under his nail. I submit that to you. By argument I do submit that to you.*

(Emphasis added).

¶45. During oral argument, the State conceded that there was no DNA present, nor was there any attempt to retrieve DNA. Instead, the State characterized such remarks as "a slip in the heat of trial." Nonetheless, we have previously recognized:

> Such statements are prejudicial because they **bait juries into believing there is a basis for the argument outside of the evidence presented.** This is especially so when the statement is made by a party who, in the minds of the jurors, has seen all of the possible evidence in the case and, if believed, would not make such a comment unless it was supported by some type of evidence.

*White*, 228 So. 3d at 909 (¶45) (emphasis added).

¶46. As the State conceded during oral argument, there was no DNA to support the State's closing. As a result, we cannot say that such comments were intended to "*fairly* sum up the evidence" when they had no basis in the evidence to begin with. *Id.* at 904 (¶28) (emphasis

15

added) (quoting *Wilson*, 194 So. 3d at 864 (¶30)). The tactics employed "state[d] facts which [were] not in evidence" and "appeal[ed] to the prejudices of men by injecting prejudices not contained in some source of the evidence." *Id.* at 904-05 (¶28) (quoting *Galloway*, 122 So. 3d at 643 (¶72)). Under long-standing precedent, this constitutes error.

¶47. In 2017, we held that the State's improper comments during closing "may not be reversible standing alone, [but] the cumulative effect of the otherwise harmless errors warrant[ed] reversal." *Id.* at 905 (¶30). In *White*, the defendant was convicted of two counts of gratification of lust and one count of statutory rape. *Id.* at 897 (¶1). Prior to the defendant's trial, the State "made a pretrial motion in limine to prevent White from using social-media evidence at trial," arguing—among other things—that "it was irrelevant." *Id.* at 900 (¶13). But "White sought to use social-media posts purported to be from [the victim] to establish the defense's theory that [she] was lying and that the alleged events never took place." *Id.* Ultimately, the circuit court granted the State's pretrial motion and "excluded social-media evidence and any other references to such." *Id.* at 908 (¶42).

¶48. On appeal, the defendant raised several errors, including that the State committed prosecutorial misconduct during its closing argument by referencing evidence the court had previously excluded and improperly commenting on the credibility of a witness. *Id.* at 908, 910 (¶¶44, 50).

¶49. We acknowledged that "because the circuit court . . . exclude[d] evidence even remotely connected to the social-media evidence, the defense was deprived of the ability to

16

present evidence supporting the defense's theory regarding [the victim's] motive to fabricate the allegations." *Id.* at 908 (¶44). In turn, the State "used the circuit court's exclusion of the evidence to argue that the defense did not provide evidence of [the victim's] motive for fabrication because none existed." *Id.* Ultimately, we found "[t]he exploitation of the court's pretrial ruling in this manner . . . misleading to the jury, prejudicial to the defendant, and improper under the findings of this Court." *Id.*

¶50. Identical to the "State's exploitation of the circuit court's pretrial ruling" in *White*, the State capitalized on the pretrial ruling by repeatedly interjecting events that occurred *after* Jane's allegation of sexual battery. Through counsel, Clark divulged photographs, videos, a ledger, and other items that, if believed, gave way to the conclusion that he and Shameka continued their relationship after the allegation arose. The State filed a motion to exclude all this evidence, specifically arguing the post-charge interactions between Clark and Shameka were irrelevant.

¶51. And as a result, the trial court broadly ruled that "*anything* that happened afterwards" would be excluded from trial. (Emphasis added). Crucially, it was the State that sought this pretrial ruling.

¶52. In contravention of this pretrial ruling, by the end of its closing, the State had improperly referred to matters outside of the record upwards of eight separate times:

- "But she's in Alabama now, and her mother took her blood over Justin

17

Clark."[2]

- "She chose her daughter over Justin Clark and told him to get out because her word was credible."

- "So the only evidence that you heard that this was all the mom's idea is the defense because they'd like to make this about the mom, rather than [Jane]."

- "Ladies and gentlemen, Mom was a distraction because Mama chose her daughter over Justin, and Justin hasn't gotten over it to this day."

- "It's not like Shameka is sharing children with Justin Clark, and she's fixing to go and ask for custody and say, 'Make all this up on him.'"

- "So exactly what interest does [Shameka] have other than that's her daughter, and she's going to be there for her daughter?"

- "But when he's caught, she chose her daughter."

- "There's been no motive given to why they would make this up."

¶53. The law is well settled that "[i]t is improper for a prosecuting attorney to comment on evidence excluded by the court." *White*, 228 So. 3d at 908 (¶44) (citing *Matthews v. State*, 148 Miss. 696, 114 So. 816, 818 (1927)). Clark's theory of defense was that Jane's mother, Shameka, had a potential motive to get Jane to fabricate the allegations of sexual battery against him. But the trial court in the instant case made clear that the only testimony that would be allowed from him or Shameka must have involved Jane's allegations or the particular incident that sparked the allegation.

¶54. Instead, the State repeatedly chose to make remarks using different variations to

---

[2] No testimony at trial supports the State's assertion that Jane lived in Alabama.

18

express how Shameka "took her blood over Justin Clark" and that "Justin hasn't gotten over it to this day," while also announcing that "there's been no motive given" and asking the jury "what interest does [Shameka] have other than that's her daughter?" Just as in *White*, the defense was deprived of the ability to present evidence supporting its theory regarding a potential motive to fabricate the allegations. We can only view the repetition in this sequence as a calculated attempt to unduly influence the jury. Therefore, the State's "exploitation of the court's pretrial ruling in this manner was misleading to the jury, prejudicial to the defendant, and improper under the findings of this Court." *White*, 228 So. 3d at 908 (¶44).

## CONCLUSION

¶55. Standing alone, each instance of misconduct in this case may not reach the level of plain error. However, when combining these instances, we see the State's "misconduct endanger[ed] the fairness of [Clark's] trial and the impartial administration of justice"; therefore, "reversal must follow." *Id.* at 904 (¶28) (quoting *Goodin*, 787 So. 2d at 653 (¶41)). As we stated in that case, "Aggregate instances of prosecutorial misconduct can lead to reversal." *Id.* at 905 (¶29) (citing *Stringer v. State*, 500 So. 2d 928, 930-31 (Miss. 1986)); *see also Minor v. State*, 402 So. 3d 1272, 1281 (¶¶27-28) (Miss. 2025) (reversing and remanding under an application of the cumulative error doctrine "[b]ecause the State pervaded the trial with errors" and "so deeply undermined the fairness of the trial"); *Berger v. United States*, 295 U.S. 78, 89 (1935) (reversing when "misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as

19

inconsequential").

¶56.   Accordingly, we reverse and remand this case to the circuit court for a new trial.

¶57.   **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. McDONALD AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**